**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| LUIGI CIOCCA, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 04-5605 |
| BJ'S WHOLESALE CLUB, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                        **NOVEMBER 14, 2011**

Presently before the Court is a Motion for Summary Judgment submitted by Defendant,

BJ's Wholesale Club, Inc. ("Defendant"), the response by Plaintiff, Luigi Ciocca ("Plaintiff"),

and Defendant's reply.  For the following reasons, we will deny Defendant's Motion.

**I.      FACTS**

Plaintiff commenced this action by filing a Complaint in this Court on December 2, 2004,

seeking damages for injuries caused by an allegedly defective snow blower purchased by

Plaintiff's parents at Defendant's store.  (Compl. ¶ 13.)  According to Plaintiff, his parents

bought the snow blower on or about January 17, 2000, and neither he nor his parents altered it in

any way since the date of purchase.  (Id. ¶ 14.)  On December 5, 2002, Plaintiff decided to use

the snow blower to remove snow from the driveway of his residence.  (Pl.'s Dep. at 27:11-13.)

He started the snow blower in the shed where his parents kept it (Id. at 29:6-10), and used it

successfully to remove snow from the driveway until he reached about one quarter of the way

down the length of the driveway, which Plaintiff estimates is about twenty feet long.  (Id. at

28:17-18).

At this point, the discharge chute of the snow blower became clogged.  (Id. at 35:9.)
After releasing the levers for the auger[1] and the traction drive located on the handles of the snow
blower, Plaintiff walked away to retrieve an approximately one and one-half foot long stick that
he planned to use to unclog the chute.  (Id. at 35:12-36:6, 75:4-14.)  It was Plaintiff's belief that
releasing the levers stopped the blades inside the machine.  (Id. at 75:10-21.)  Plaintiff left the
snow blower running during the ten minutes that he went to retrieve the stick, despite the fact
that he had seen placards on the snow blower that cautioned against leaving the snow blower
running when unattended.  (Id. at 79:22-80:13.)  When Plaintiff returned with the stick, he used it
to push the snow back into the discharge chute.  (Id. at 37:23-38:7.)  As he was unclogging the
discharge chute with the stick, he felt the machine tugging the stick and his hand into the chute.
(Id. at 38:17-39:8.)

Plaintiff's father was outside with Plaintiff when this incident occurred.  (Id. at 33:17-
34:4.)  Immediately after the accident, Plaintiff approached his father, who then brought him into
the house.  (Id. at 39:15-24.)  Upon entering the house, Plaintiff took off his work gloves and
realized that his hand had been cut.  (Id. at 39:11-17.)  Plaintiff then fainted and was taken to
Frankford hospital.  (Id. at 40: 1-12.)  As a result of the accident, one of Plaintiff's fingers had to
be amputated and another finger was severely cut.  (Id. at 71:17-72:2.)  Specifically, Plaintiff's
injuries consisted of a comminuted fracture of the middle phalanx of his left index finger with an
amputation distal to the fracture.  (Pl.'s Resp. to Interrog. No. 3.)  He also sustained a transverse

---

[1] Auger is defined as "any of various tools or devices having a helical shaft or member
that are used for boring holes (as in wood, soil, or ice) or moving loose material (as snow)."
Merriam-Webster Dictionary, (Oct. 25, 2011), http://www.merriam-webster.com/dictionary/auger.

fracture of the middle phalanx of the left middle finger with comminuted fragments.  (Id.)  On

December 9, 2002, he underwent surgical revision of the amputation with flap closure, and

surgical repair of the laceration and fracture of the middle finger.  (Id.)  Plaintiff is now

permanently disfigured.  (Id.)

Plaintiff testified at his deposition that he was aware that "getting [his] hand or putting

[his] hand into the discharge shoot may cause injury if the blades were still moving."  (Id. at

61:22-62:2.)  Plaintiff further testified that he had previous experience with snow blowers and

lawnmowers and that he was "aware of the possibility that if the blade was still moving and [he]

stuck a stick or something in there that the stick would get pulled in."  (Id. at 64:8-13.)  However,

when asked whether Plaintiff was "aware that if [he] were still holding that stick [he] might get

pulled in [or that his] hand could go with it," he responded that he did not remember.  (Id. at

64:14-17.)

Plaintiff filed a Complaint in this Court on December 2, 2004, against Defendant and the

manufacturer of the snow blower, Murray, Inc. ("Murray") (collectively, "Defendants"), alleging:

(1) strict liability against Defendants under § 402A of the Restatement (Second) of Torts; (2)

negligence against Murray for failing to properly design, manufacture, assemble, inspect, and test

the snow blower; (3) negligence against Defendant for failing to properly assemble, test, and

inspect the snow blower; (4) breach of implied warranty against Murray; and (5) breach of

express warranty against Murray.  On January 10, 2005, we received a Suggestion of Bankruptcy

indicating that Murray had filed for Chapter 11 and that all civil actions against it were to be

stayed, including the present action.  On February 15, 2005, Defendant filed its Answer with

Affirmative Defenses and Crossclaim against Murray, alleging that Murray would be solely

3

liable, or at least jointly and severally liable, and would be liable to Defendant for contribution and indemnity in the event that we found in favor of Plaintiff.

On January 23, 2006, we placed this case in the civil suspense file due to Murray's Chapter 11 proceedings.  On October 29, 2010, Defendant filed a Motion to transfer this case from the civil suspense file to the active docket, indicating that Murray had dissolved and that Plaintiff wished to pursue his strict product liability claim (Count I) and negligence claim (Count III) against Defendant.  On November 1, 2010, we granted Plaintiff's Motion and transferred this case back to the active docket.

On December 17, 2010, we issued a Scheduling Order requiring Plaintiff to submit his expert reports to Defendant by May 18, 2011.  We expressly ordered that any proposed changes to the Scheduling Order would be considered by written motion only.  On June 16, 2011, Plaintiff emailed Defendant an untimely expert report compiled by Mr. Craig D. Clauser, P.E. ("Clauser"), without this Court's authorization and without any explanation for its untimeliness. On June 21, 2011, Defendant filed a Motion in Limine to preclude the expert report written by Clauser ("Clauser Report") arguing that allowing Plaintiff's untimely submission would cause it prejudice, would unreasonably delay the proceedings, and was otherwise unauthorized in the first instance.  On August 12, 2011, we denied Defendant's Motion in Limine; however, Defendant was granted an additional thirty days to complete its own expert discovery.  As of today's date, the Court has not received any information from Defendant regarding such additional expert discovery.

Defendant filed the instant summary judgment motion on June 7, 2011, arguing that: (1) Plaintiff cannot prove his case without expert testimony; (2) Plaintiff had assumed the risk of his

injuries; and (3) Plaintiff cannot produce any evidence of negligence on the part of Defendant. On June 28, 2011, Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response") was filed relying, in part, on the Clauser Report.  Defendant replied to Plaintiff's Response on July 6, 2011.

## II.    STANDARD

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"  Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III.   DISCUSSION

As noted above, the strict product liability[2] and negligence claims against Defendant remain in this action. Defendant argues that it is entitled to summary judgment based upon the following three premises: (1) Plaintiff assumed the risk of his injuries; (2) Plaintiff's strict product liability claim fails because he did not produce any expert testimony or provide any factual basis to conclude that the snow blower was defective; and (3) Plaintiff failed to adduce any evidence of negligence by Defendant. We will discuss each in turn.

### 1.   Assumption Of Risk

Assumption of risk is a complete defense to strict product liability and negligence claims under Pennsylvania law.[3] Martinez v. Triad Controls, Inc., 593 F. Supp. 2d 741, 765 (E.D. Pa. 2009) (citing Karim v. Tanabe Mach., Ltd., 322 F. Supp. 2d 578, 581 (E.D. Pa. 2004)); see also

---

[2] The three types of actionable product defects are manufacturing defects, design defects, and failure to warn defects. See Phillips v. A–Best Prods., Co., 665 A.2d 1167, 1170 (Pa. 1995)). It appears that Plaintiff's strict product liability claim is based upon manufacturing and design defects since he states that he "is not advancing a failure to warn theory." (Pl.'s Resp. Def's Mot. Summ. J. ¶ 51.)

[3] Pennsylvania's substantive law applies to this action because diversity cases, such as this case, require the application of federal procedural law and state substantive law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Hanna v. Plumer, 380 U.S. 460, 465 (1965).

Dillinger v. Caterpillar, Inc., 959 F.2d 430, 445 (3d Cir. 1992) ("The Pennsylvania courts have

consistently held that a plaintiff's assumption of the risk is a defense to strict products liability.");

Kaplan v. Exxon Corp., 126 F.3d 221, 224-25 (3d Cir. 1997) (assumption of risk is available in

negligence claims).  In order to prevail on the assumption of risk defense in either a strict liability

or negligence claim, "a defendant must 'produce evidence that the plaintiff fully understood the

specific risk, and yet voluntarily chose to encounter it.'"  Blake v. Greyhound Lines, Inc., 448 F.

Supp. 2d 635, 642 (E.D. Pa. 2006) (quoting Robinson v. B.F. Goodrich Tire Co., 664 A.2d 616,

644 (Pa. Super. Ct. 1995)); see also Martinez, 593 F. Supp. 2d at 765.

Defendant contends that it cannot be held liable as a matter of law because Plaintiff

voluntarily assumed the risk of his injuries since he "placed his hand in harms way knowing the

danger, voluntarily proceeded in the face of that known danger, and was injured."  (Def.'s Mem.

of Law Support Mot. Summ. J. at 18.)  Relying upon Plaintiff's deposition testimony, and

pointing to the snow blower's warning labels specifically instructing that the engine be stopped

before clearing a clogged discharge chute, Defendant argues that Plaintiff fully understood the

risks involved with placing his hands and a stick near moving blades of the discharge chute, as

well as the risks involved in failing to turn off an engine prior to placing his hands near moving

parts.  (Id. at 8-19.)

Plaintiff counters Defendant's argument by asserting that he did not appreciate any

specific risk when he attempted to clear the clogged discharge chute because when he released

the two levers on the snow blower's handlebars (one which creates traction/forward motion and

the other which causes rotation of the auger blades) he believed that he had stopped everything.

(Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 6-8.)  Specifically regarding the auger blades,

Plaintiff argues that he was not aware that they would be turning when he cleared the clogged discharge chute because "he believed that the blades could not turn until he engaged the control lever on the handlebar, which is how the machine was designed to operate." (Id. at 7.) As for the warning placards instructing that the snow blower's engine be turned off prior to unclogging the discharge chute, Plaintiff asserts that he recalled one sticker on the snow blower that said "stop the engine" which he believed meant that "when you stop the levers, that stops everything." (Id., Ex. B, Pl.'s Dep. at 30:10-24, 31:1-12.)

Relying upon the Clauser Report, Plaintiff argues that Clauser examined the subject snow blower and concluded that "the cable tension in the impeller/auger linkage was improperly adjusted such that when the lever was fully released, the belt drive was not released and the brake was not set." (Id. at 3; Ex. A, Clauser Rpt. at 2.) This alleged improperly adjusted control linkage, according to Clauser, caused the incident to occur because of the following:

> the impeller was turning under power when Mr. Ciocca attempted to clear the discharge chute. The impeller was able to turn with the auger control lever released (in the OFF position) because the snow blower was negligently assembled and sold to the Ciocca's in a defective condition.

(Id. at 8; Ex. A, Clauser Rpt. at 4.) Focusing on the alleged specific defect at issue; namely, the improperly adjusted control linkage, Plaintiff argues that he was unaware of the defect and the specific risk associated with it and, therefore, did not voluntarily chose to encounter it. (Id. at 6-8.)

Genuine issues of material fact exist as to whether Plaintiff knew of the specific defect at issue and voluntarily chose to encounter it. "[O]nly if a plaintiff fully understands the specific risk, voluntarily chooses to encounter it, under circumstances that manifest a willingness to

accept it, is he said to have assumed the risk." <u>Karim</u>, 322 F. Supp. 2d at 581 (citation omitted).

In light of Plaintiff's argument that he was unaware that the auger blades would be turning when

he cleared the clogged discharge chute because he believed that they could not turn until he

engaged the control lever on the handlebars, and Clauser's conclusion that the auger control

linkage was faulty because it was improperly adjusted, reasonable minds could disagree

regarding the facts of which Plaintiff was aware, and whether he believed that his conduct was

placing him in danger.  Assumption of risk is a question for the jury "unless reasonable minds

could not disagree." <u>Kaplan</u>, 126 F.3d at 225.  Accordingly, Defendant's Motion for Summary

Judgment regarding its assumption of risk defense will be denied.

### 2.  Expert And Factual Support For Strict Product Liability Claim

Plaintiff served his expert report, the Clauser Report, on Defendant after the date set forth

by the Court's Scheduling Order resulting in Defendant filing its Motion for Summary Judgment

prior to its receipt of the Clauser Report.  Consequently, Defendant moved for summary

judgment asserting that Plaintiff did not  properly support his strict product liability claim by

failing to provide expert analysis or factual support.  (Def.'s Mem. Law Support Mot. Summ. J.

at 19-23.)  In light of Plaintiff's production of the Clauser Report, Defendant's premise that it is

entitled to summary judgment because of a lack of expert and factual support is no longer valid.

Defendant's Reply Brief in Support of the Motion for Summary Judgment ("Reply Brief") asks

the Court to disregard the untimely report of Mr. Clauser.  As stated earlier, after the filing of the

Reply Brief, we denied  Defendant's Motion in Limine attempting to preclude the Clauser Report

by an Order and Memorandum Opinion dated August 12, 2011.  The Order and Memorandum

Opinion addressed the untimeliness of the Clauser Report deciding that it should be included in

this action.  Since the Clauser Report is a part of this case, Defendant's Summary Judgment

Motion regarding the failure of Plaintiff to support his strict product liability claim with expert

and factual support will be denied.

### 3.  Evidence Of Negligence

Along the same lines as the previous argument, Defendant's Motion for Summary

Judgment argues that Plaintiff failed to produce any expert testimony or provide any factual basis

to conclude that Defendant was negligent.  Plaintiff's negligence claim is based upon the alleged

improper assembly of the snow blower, as well as the alleged failure to properly inspect, test,

and identify a kinked cable that allegedly prevented the proper operation of the brake intended to

stop the impeller blade upon the release of the clutch lever.  (Compl. ¶ 28.)

Relying upon the deposition testimony of its own corporate representative, Mario

Concepcion, Defendant argues that if it indeed sold the subject snow blower, it was sold in a

boxed condition with assembly to be conducted by the purchaser.  (Def.'s Mem. Law Support

Mot. Summ. J. at 23-25.)  Mr. Conception testified that the only assembly, if any assembly,

Defendant would have performed on the subject snow blower was to have raised the handles on

the display unit.  (Def.'s Reply Br. Support Mot. Summ. J. at 4, Conception Dep. 21:18-25:22,

23:1-23.)  Regarding the assembly of snow blowers by Defendant, Mr. Conception explains:

> [w]hen we give merchandise in the building, we display a unit . . .
> so the customer can see how the unit look like [sic], see if they like
> it or not.  The only thing the company does when they display a
> unit -- and this specific unit, they only put the handles on it.  They
> don't connect anything else to it, no gas line, no cables or anything
> else to it, just the handle.  That's it.

(Id. at 5; Conception Dep. 21:23-25:22.)  Thus, according to Defendant, "if there was a 'kink' in

10

a cable of the machine, it would have manifested itself after the sale by BJ's to Plaintiff's

parents." (Def.'s Mem. Law Support Mot. Summ. J. at 25.)

The Clauser Report, filed after Defendant moved for summary judgment, includes

analysis that Defendant negligently assembled and inspected the snow blower. (Pl.'s Resp.

Def.'s Mot. Summ. J.; Ex. A, Clauser Rpt. at 1-4.) Clauser relied, in part, upon an affidavit by

Plaintiff's father, Antonio Ciocca ("Affidavit"). (Id.) In the Affidavit, Plaintiff's father states

that he purchased the snow blower fully assembled from Defendant.[4] (Id.; Ex. D, Ciocca Aff.

¶¶ 3-4.) Plaintiff's father further states that he was informed by an employee of Defendant that

he had purchased the last snow blower in stock, and one of Defendant's employees assisted him

in loading the snow blower onto his pickup truck and he drove it home. (Id.) Defendant's father

also states that "I put gasoline in the snow blower and started it up once, on the night I purchased

it, but did not use it to move snow." (Id.; Ex. D, Ciocca Aff. ¶ 5.)

Since the Affidavit creates a genuine issue of material fact regarding whether Defendant

assembled the snow blower, Defendant asks that we disregard it questioning its validity and the

timing of its production which was after the filing of Defendant's Motion for Summary

Judgment. We will not disregard the Affidavit. In this case, the timing of the production of the

Affidavit alone, as well as Defendant's generalized conclusion regarding its invalidity, do not

warrant the disregarding of the Affidavit. The Affidavit meets the requirements set forth in

Federal Rule of Civil Procedure 56(e) because it is based on Plaintiff's father's personal

---

[4] Plaintiff's Response also includes a copy of a facsimile of a credit card statement of Plaintiff's parents purporting to show that on January 27, 2000, they purchased the subject snow blower at Defendant's Philadelphia, PA, location for $748.89. (Pl.'s Resp. Def.'s Mot. Summ. J.; Ex. C, Credit Card Statement Facsimile.)

knowledge, sets forth facts that would be admissible in evidence, and affirmatively shows that he is competent to testify to the matters stated therein.  See Fed. R. Civ. P. 56(e).

Defendant also asks that the Affidavit be disregarded pursuant to the "sham affidavit doctrine" which sets forth that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit *disputing his or her own sworn testimony* without demonstrating a plausible explanation for the conflict."  Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (citing Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991)).  However, the "sham affidavit doctrine" does not apply in this case because Plaintiff's father was never deposed; therefore, his affidavit does not directly contradict any prior testimony by him.  See Drayton v. Pilgrim's Pride Corp., 472 F. Supp. 2d 638, 643 n.30 (E.D. Pa. 2006) (finding that a declaration by a person who was never deposed does not contradict any prior testimony and, instead, treating the new information as supplementing the record).  Even admitting that the "sham affidavit doctrine" does not "strictly" apply, Defendant asks that it be applied because the Court has broad discretion in viewing the evidence before it.  (Def.'s Reply Br. Support Mot. Summ. J. at 6.)  We refuse to use our discretion to disregard the Affidavit based upon the "sham affidavit doctrine" because it is inapplicable to the facts of this case.  Whether the Affidavit is untrue requires a credibility determination that must be performed by a jury.  Upon consideration of the Affidavit, and the Clauser Report, we deny Defendant's Summary Judgment Motion as it pertains to Plaintiff's alleged failure to factually support his negligence claim.

## IV.    CONCLUSION

Examination of the record, including the Clauser Report and the Affidavit, reveals that Defendant has not proven that Plaintiff assumed the risk of his injuries.  Likewise, the record

shows that Plaintiff has sufficient expert and factual support for his strict product liability and

negligence claims to survive summary judgment.  Consequently, Defendant's Motion for

Summary Judgment is denied.

An appropriate Order follows.